**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Luigino's, Inc.,
a Minnesota corporation,

Plaintiff,

v.

Robert Peterson, individually, and
IBP, Inc., a Delaware corporation,

Defendants.

Civil No. 00-1246 (DWF/RLE)

**MEMORANDUM OPINION AND ORDER**

---

David H. Simmons, Esq. and Dale T. Gobel, Esq., Drage, deBeaubien, Knight, Simmons, Mantzaris & Neal, 332 Magnolia Avenue North, P.O. Box 87, Orlando, Florida 32802, appeared on behalf of Plaintiff.

Ronald J. Schutz, Esq., Emmett J. McMahon, Becky R. Thorson Esq., and Rita Coyle DeMeules, Esq., Robins, Kaplan, Miller & Ciresi, 2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, Minnesota 55402-2015, appeared on behalf of Defendant.

---

**Introduction**

The above-entitled matter came on for hearing before the undersigned United States District Judge on August 17, 2001, pursuant to the parties cross-motions for summary judgment, motions by both parties to exclude certain expert testimony and affidavits, and Plaintiff's Motion to Withdraw and Amend its Responses to Defendants' Requests for Admissions. For the reasons set forth below: (1) Plaintiff's Motion to Amend and Withdraw is denied; (2) Plaintiff's Motion for Summary Judgment is denied; (3) Defendants' Motion for Summary Judgment is granted; and (4) the parties' respective motions to exclude certain expert testimony are denied as moot.[1]

---

[1] The parties have filed numerous motions to exclude certain expert testimony. However, the Court does not need to reach the merits of these motions in order to decide the merits of the parties' cross-motions for summary judgment. Even if the Court were to consider

(continued...)

FILED JAN 28 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JAN 28 2002
DEPUTY CLERK

## Background

The parties were previously before the Court on December 8, 2000, pursuant to Plaintiff's Motion for a Preliminary Injunction. The Court denied Plaintiff's motion, and the parties are now back before the Court on the parties' Cross-Motions for Summary Judgment and the parties' various motions to exclude certain expert testimony. The Court will again summarize the relevant facts.

Plaintiff Luigino's, Inc. ("Luigino's") is a privately-owned Minnesota corporation of which the primary business is the wholesale production of frozen food entrees for retail sale, sold mainly under the trade name "Michelina's." In 1998, Luigino's engaged in negotiations with Defendant IBP, Inc. ("IBP"), for the sale of Luigino's to IBP. IBP is involved primarily in the packaging of meat products for sale at grocery stores nationwide, and it is the parent corporation of numerous subsidiary corporations. Defendant Robert Peterson was and continues to act as the CEO and Chairman of the Board for IBP, and thus, was directly involved in the negotiations with Luigino's. Larry Shipley, the Chief Financial Officer of IBP, was also involved in the negotiations with Luigino's. While no agreement was ever reached, the parties continued to entertain possibilities through April 2000.

In order to facilitate the sale, Luigino's engaged the investment banking firm Goldsmith, Agio, Helms & Co. ("GAHC"). During the negotiations, GAHC provided to IBP a Confidential Memorandum that provided an overview of Luigino's business, including its financial structure

---

[1](...continued)
the testimony of the contested experts, the Court's determinations on the motions for summary judgment would be no different. While much of the contested testimony relates to the issue of damages, the issue of causation, *i.e.*, not whether the success of Jose Ole caused the damage, but whether the alleged misconduct was causally related, as will be addressed by the Court below, however, remains the fatal element of the majority of Plaintiff's claims.

and potential growth opportunities, concluding that IBP was not a direct competitor of Luigino's. (Plaintiff's Memorandum in Support of Summary Judgment, p. 3) (hereinafter "Plaintiff's Memo in Support"). By way of contrast, Plaintiff considered entities Heinz, ConAgra, and Nestle to be competitors in the frozen food industry and thus either did not provide a Confidential Memorandum or at least provided a redacted copy of the Confidential Memorandum.[2] Defendants contend, and Plaintiff does not contest that, upon issuing the Confidential Memorandum, Plaintiff was well aware of the various business ventures of IBP, including the presence of a subsidiary, Foodbrands–owner of Specialty Brands ("SBI"), which is involved in the retail frozen Mexican food market.

As of 1998, Foodbrands manufactured hand-held frozen tacos, burritos, and snack items primarily for sale in delis, convenience stores, and warehouse clubs, but typically not for sale in the traditional frozen food aisle of grocery stores. Since 1995, SBI sold frozen Mexican food under the brand names: Butcher Boy, Posada, Little Juan, and Marquez. Indeed, in April 1996, Luigino's ordered several cases of SBI's frozen products which included items packaged for retail sale under the Posada brand. Luigino's placed additional orders for SBI's Mexican products in February and September 1999. Moreover, GAHC had a copy of IBP's 1997 Annual Report which included information relating to SBI's "Mexican Specialty Products."

In early 1998, the Luigino's Confidential Memorandum was provided to IBP pursuant to a Confidentiality Agreement entered into by the parties, which states in relevant part that:

---

[2] As the Court stated at footnote 1 in its December 13, 2000, Memorandum Opinion and Order, the Court has yet to receive a copy of a redacted Confidential Memorandum, despite Plaintiff's representation that one was provided as "Exhibit B" to Affidavit Ronald O. Bubar, filed in support of Plaintiff's Motion for a Preliminary Injunction.

> * * *
>
> 2. . . . [IBP's] obligation hereunder to hold the information confidential does not apply to: (a) information which is published or otherwise becomes available to the general public through no act or failure to act on the part of [IBP];
> (b) information which is proprietary known to [IBP] at the time of disclosure;
> (c) information which is subsequently acquired by [IBP] from a third party who has a bona fide right to make such information available without restriction or
> (d) information developed independently by [IBP's] employees who are not privy to "information."
>
> 3. [IBP] agrees to share confidential information concerning [Luigino's] with a limited number of [IBP's] employees or directors, on a need-to-know basis only, and will not disclose the information, including the identity of [Luigino's] to any other party, unless and until approved in writing by [Luigino's].
>
> * * *
>
> 6. This information shall not be disclosed to any agent, consultant or third party unless they agree to execute and be bound by the terms of this AGREEMENT and have been previously approved by GAHC and [Luigino's] in writing.
>
> * * *

Plaintiff maintains that the Confidentiality Agreement was breached because IBP provided the Confidential Memorandum to unauthorized persons such as Bain & Company and Donaldson Lufkin & Jenrette, IBP's consultants for the potential purchase of Luigino's; Randy Devening, President of Foodbrands; and Patrick O'Ray, President of SBI. Plaintiff makes particular note of the fact that Bain and Company was also dealing with O'Ray of SBI. O'Ray states that he has had contact with Bain and Company on only two occasions, once via a short telephone call in December 1998 relating to an acquisition of a business unrelated to the IBP/Luigino's negotiations, and again in 2000 to discuss a potential e-commerce project. Plaintiff also contends that although Devening thought Luigino's would fall under his control if

it was purchased, Shipley and Peterson deny this possibility. However, Plaintiff points to no evidence in the record to support such a contention.

Because the parties ultimately could not agree on a purchase price nor a structure for the transaction, in December 1998, Luigino's initiated a public sale of bonds in order to raise $100 million for the company. Plaintiff contends that the bond underwriters recommended that Luigino's invite outside directors to join the board. In a December 23, 1998, letter from Jeno Paulucci, the owner and CEO of Luigino's, Defendant Peterson was invited to join Luigino's advisory board of directors in order to "keep an eagle eye on the business." By a December 29, 1998, letter, Paulucci acknowledged Peterson's acceptance of his invitation to join the newly established board and indicated that they would be seeing each other shortly after the new year.

In January 1999, Luigino's asked Peterson to complete a questionnaire provided to each board member to elicit "certain information required to be disclosed in the [Bond] Offering Memorandum." Plaintiff maintains that Peterson's seat on the board was conditioned upon his responses to the questionnaire. To the question: "Are you aware of any services or products of any other company on whose board you sit which could be regarded as competitive with those of [Luigino's]?; Peterson answered "No." However, in a space left for explanations relating to an answer of "Yes," Peterson went on to state: "IBP and its subsidiaries manufacture food products, however, none of these products directly compete with [Luigino's]." By early 1999, Peterson joined the Advisory Board of Directors, and by Summer 1999, Peterson was named Vice Chairman, pursuant to Paulucci's request as evidenced in a July 13, 1999, letter.

During the course of his involvement on the board, Mr. Peterson attended quarterly board meetings. The parties dispute the nature and extent of information to which Peterson was

exposed during these meetings. The most relevant disputed topic relates to discussions of potential product lines of Mexican or Southwestern frozen entrees, namely the "Howlin' Coyote" product line acquired by Luigino's in 1999. "Howlin' Coyote" is a Southwestern frozen food product line, consisting of six frozen chilis and three bottled salsas. Plaintiff maintains that during the July 1999 board meeting and perhaps also the April 1999 meeting, Peterson received information, primarily by way of a PowerPoint presentation by Joel Kozlak, CFO of Luigino's, that Luigino's was intending to use Howlin' Coyote as a "beachhead" for a broader product line of Mexican frozen foods and entrees. In support of this contention, Plaintiff cites to the depositions of Kozlak and Larry Nelson, President of Paulucci International. While Nelson does maintain that the presentation was given at the July meeting, his recollection is dim, as evidenced by counsel's questioning and the deponent's responses; and the portions of Kozlak's deposition that have been included in the record contain absolutely no evidence to support Plaintiff's contention, but rather explain that such a presentation was likely provided in Kozlak's presence at a sales meeting at which Peterson was not alleged to have been present.[3]

In February 2000, Specialty Foods, Inc., the aforementioned subsidiary of IBP, launched "Jose Ole," a new product line of premium priced Mexican frozen entrees. Luigino's became aware of the product line through reports in a trade magazine, and it subsequently removed Mr. Peterson from the Board for his alleged breach of fiduciary duty, having failed to disclose his corporation's competitive endeavor. Defendants contend that Mr. Peterson was unaware of Specialty Foods' development and launching of the "Jose Ole" line until February 2000 when

---

[3] While the Court makes no judgment as to whether the presentation occurred as Plaintiff contends, the Court reminds counsel that a portion of the record should only be cited for that which it can reasonably be read to represent, and no more. The density of a record in any given case is no excuse for citations that are imprecise, inaccurate, or wholly unfounded.

SBI made a capital expenditure request of the IBP board. Plaintiffs respond alleging that Mr. Peterson had to have been aware of "Jose Ole" and the relevant conflict given his directorial and financial responsibilities and his inevitable interactions with Larry Shipley, who sat on the board of Foodbrands and who also was intimately involved in the negotiations with Luigino's.

**SBI's Launch of Jose Ole**

Defendants contend that the idea for Jose Ole began back in 1995 when Patrick O'Ray became president of SBI. In 1997 and early 1998, O'Ray assembled a team of individuals to develop an umbrella brand for the various lines of frozen foods already manufactured by SBI. Robert Berry was hired as Marketing Director for SBI in July 1998, and Defendants maintain that he forthwith conducted market research that was ultimately relied upon in launching Jose Ole. Berry issued a 10-chapter marketing plan in 1999 that recommended in part: (1) "Develop first consumer-focused brand to capitalize on under-developed frozen Mexican food segment." and (2) Develop new products, such as "appetizers/snacks (2-3 SKUs; mini burritos, stuffed nachos, pocket sandwiches, etc.; handheld entrees (4-5 SKUs); burritos, chimichangas, gorditas, taquitos, etc.; dinners/entrees (2-3 SKUs); casseroles/bakes, chicken bowls, tamale pies, Mexican pizzas, chilis, etc."

In December 1998, Randy Devening, CEO of Foodbrands, and O'Ray met with Shipley in order to review SBI's business plan for 1999 which included expenses for Project Phoenix, the name for the research and development project that resulted in the launch of Jose Ole. Defendants maintain that consultants were paid over $3 million in the development of Jose Ole, but that such expenditures did not require approval of the IBP board because research and development costs are not considered capital expenditures. As a result, Defendants contend that

Defendant Peterson first heard about the Jose Ole product line when SBI submitted a capital expenditure request to the IBP board on February 18, 2000.

As stated above, the Jose Ole line was launched in April 2000. In June 2000, Nestle also launched a line of Mexican frozen foods, akin to the Jose Ole line, under the name brand Ortega.

**Luigino's Experience with Mexican Frozen Food and Howlin' Coyote**

While Luigino's never consistently pursued a Mexican frozen food line prior to the launching of Jose Ole, it did experiment with the Carlos & Maria's line which it abandoned in 1995-1996. Mr. Paulucci stated during his deposition that Carlos & Maria's was abandoned because "it was not profitable because of the low image of Mexican food." Mr. Paulucci went on to explain that it was this image that prompted Luigino's to consider the Howlin' Coyote line which it designated as Southwestern, a potentially lucrative "departure" from "strictly Mexican." Luigino's acquired the Howlin' Coyote line in January 1999 and, in the minutes from the April 1999 board meeting, described the line as Southwestern/Caribbean/Cajun. In September 1999, in conjunction with its order of SBI Mexican products, Luigino's invited an SBI representative to tour its Ohio manufacturing plant and explained its interest in possibly using SBI products for the new Howlin' Coyote line. Ultimately, however, as expressed in a January 2000, memorandum sent to GAIIC, Kozlak, and Ron Bubar, President of Luigino's, Paulucci indicates that Luigino's would not be "pushing" Howlin' Coyote in 2000, given slotting fees, but that, pending market test results, the line would be promoted further in 2001 and later years. On June 14, 2000, in an internal memorandum from Ron Bubar to Joel Conner, Luigino's suspended expansion of the Howlin' Coyote because of the perceived success and strong financial backing of the Jose Ole and Ortega lines. Luigino's now markets a line of frozen Mexican foods under the brand name, Michelina's Fiesta.

## Discussion

### 1. Plaintiff's Motion to Withdraw and Amend Responses to Defendants' Request for Admissions

Plaintiff submits its Motion to Withdraw and Amend based on an alleged scrivener's error. On May 30, 2001, Defendants served upon Plaintiff 397 discovery requests for admissions. Plaintiff submitted 396 responses to Defendants' requests on June 29, 2001. However, on August 10, 2001, seven days before the hearing on the parties' cross-motions for summary judgment, Plaintiff submitted this motion, maintaining that it inadvertently failed to respond to Defendants' request number 161, and, as such, each of the subsequent responses actually corresponds with one number greater request.

Rule 36(b) of the Federal Rules of Civil Procedure provides that: "the court may permit withdrawal or amendment [of admissions] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." The Court agrees with Defendants' position that an amendment as Plaintiff has requested would substantively change the admissions to a substantial portion of Defendants' requests. In contrast, Plaintiff has pointed to no specific admission which, without amendment, would compromise its ability to defend its position on the merits of this case. Such a careless oversight no doubt compromises the reliability and ultimate usefulness of the admissions for either party. Nonetheless, in order for the Court to reach its decision on the merits, as outlined below, the Court did not rely in any way on Plaintiff's admissions, but instead relied upon facts otherwise established by the record. The Court declines to allow Plaintiff to withdraw and

amend its admissions, but even if the Court were to determine such amendment to be appropriate, the Court's ultimate decision on the merits would remain the same.

**2. Defendants' Motion for Summary Judgment**

**a. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**b. Issues**

**i. Negligent Misrepresentation**

Plaintiff bases its claim of negligent misrepresentation on Defendant Peterson's response to a questionnaire in support of a bond offering in 1999, indicating that IBP should not be regarded as "competitive" and stating that "IBP and its subsidiaries manufacture food products, however, none of these products directly compete with [Luigino's]."[4] Defendants contend that Defendant Peterson's statement was truthful, and irrespective of its truthfulness, Luigino's purported reliance on the statement upon making the alleged disclosure of confidential and proprietary information was unreasonable.

As set forth in the Section 552 of the Restatement (Second) of Torts and as adopted by the Minnesota Supreme Court, in order to establish a claim of negligent misrepresentation, a plaintiff must establish the following elements:

> (1) One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in subsection (3), the liability stated in subsection (1) is limited to loss suffered
>
> (a) By the person or one of the persons for whose benefit and guidance he intends to supply the information, or knows that the recipient intends to supply it; and

[4] In light of the March 23, 2001, Order in this case, the only statement upon which Plaintiff has been permitted to base a claim of negligent misrepresentation is the statement addressed by the Court in its analysis above.

(b) Through reliance upon it in a transaction which he intends the information to influence, or knows that the recipient so intends, or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Bonhiver v. Graff,* 248 N.W.2d 291, 298-99 (1976) (quoting Restatement (Second) of Torts § 552). In sum, Luigino's must establish that Peterson's statement on the questionnaire was false, that he intended Luigino's to rely on the statement to its detriment, and that indeed Luigino's did rely on the statement.

Luigino's maintains that Peterson's statement is false because it did not reveal the existence of the Jose Ole line.[5] However, Luigino's has presented no evidence to show that, in January 1999, Peterson was at all aware of Project Phoenix or the Jose Ole line. Luigino's has only made conclusory allegations that because Larry Shipley allegedly knew of the project, that Peterson also must have known and that because Peterson is the CEO of IBP, that he also must have known about the endeavors of the subsidiary SBI. As a matter of law, such conclusory allegations cannot give rise to a reasonable inference that Peterson knew about the Jose Ole line. The parties spend significant time in their discussion of this claim, and others, disputing their respective definitions of competition and the extent to which these definitions varied over time

---

[5] While Plaintiff's position has not always been clear to the Court, the Court does not read Plaintiff's argument on this claim to imply that Peterson's statement was false with respect to whether the pre-Jose Ole SBI frozen foods, *i.e.*, hand-held items already for retail sale, compete with Michelina's frozen entrees. Despite the vacillation of definitions for competition that have been presented throughout this case, however, Luigino's has admitted that it was aware of the pre-Jose Ole SBI items and did not deem them competitive with Michelina's products. Accordingly, Peterson's answer and explanatory statement is not inconsistent with Luigino's admitted position on the extent to which SBI competed with Luigino's before the launch of Jose Ole.

and thus impact their relative positions on the merits. Nonetheless, the Court does not find that a dispute in definition determines the outcome on this claim. Whether Jose Ole does or does not compete with Michelina's based on ethnicity, price point, or mere presence in the frozen food aisle, Luigino's has presented no evidence that could support the allegation that Peterson knew about Jose Ole at the time that he responded to the questionnaire.

The Court's analysis could end there. However, Plaintiff has also failed to direct the Court to any evidence to support its allegations that Peterson intended that Luigino's rely on his statement nor that Luigino's did rely on that statement in keeping Peterson on the advisory board and allegedly divulging proprietary information, resulting in damage to Luigino's. Again, Plaintiff's allegations are wholly conclusory and unsupported by any evidence in the record that could reasonably support any such inferences. On its face, the questionnaire was intended to elicit information from board members for the purpose of compiling the bond offering memorandum. Plaintiff now makes the claim that it relied on this statement in placing Peterson on the board. Given the timing of Paulucci's invitation to Peterson to serve on the board and his subsequent acknowledgment of Peterson's acceptance, a trier of fact could not reasonably conclude that the questionnaire was a precondition to service. However, even construing Plaintiff's argument to mean that Luigino's would not have kept Peterson on the board had it known of Jose Ole, Plaintiff has still directed the Court to no evidence in the record that could support the inference that Peterson intended Luigino's to rely on his statement to its detriment.

In sum, the Court finds that Plaintiff has failed to create a genuine dispute of material fact with respect to Peterson's statement on the bond offering questionnaire as it relates to Plaintiff's claim of negligent misrepresentation. According, the Court shall dismiss Plaintiff's claim of negligent misrepresentation with prejudice.

### ii. Misappropriation of Trade Secrets

#### a. In General

Luigino's alleges that Peterson and IBP misappropriated trade secrets in two ways: (1) by Peterson's presence on the Luigino's board of directors; and (2) by information exchanged between Luigino's and IBP during the purchase negotiations. In its memorandum in opposition to Defendants' motion for summary judgment, Luigino's contends that Peterson was exposed to the following trade secrets: "(1) the details pertaining to the launch of Howlin' Coyote; (2) Luigino's top 10 customers by volume; and (3) Luigino's research and development information." The following information are the alleged trade secrets Luigino's contends were revealed to IBP during the negotiations: "(1) the Offering Circular; (2) Luigino's financial information; (3) a second Offering Circular pertaining to snack items; (4) income statements and documents reflecting volume and sales margins; and (5) EBITDA projections for Luigino's through 2004."

#### b. "Trade Secret"

Under the Minnesota Uniform Trade Secrets Act, a trade secret is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. § 325C.01, subd. 5. In determining whether an item is a trade secret, courts in this District require that a party establish the following three factors: (1) the information must not be generally known or readily ascertainable; (2) the information must derive independent economic

value from secrecy; and (3) the party asserting the misappropriation must have made reasonable efforts to maintain secrecy of the item. *Lasermaster Corp. v. Sentinel Imaging, a Div. of Sentinel Business Systems, Inc.*, 931 F. Supp. 628, 635 (D. Minn. 1996) (citations omitted). Although absolute secrecy is not required, the confidential measures must be "reasonable under the circumstances." *Id.* (citations omitted).

In order to successfully seek protection of a trade secret, a plaintiff must identify the trade secret with sufficient specificity so that appropriate relief may be granted. *Porous Media Corp. v. Midland Brake, Inc.*, 187 F.R.D. 598, 600 (D. Minn. 1999) ("Failure to identify the trade secrets with sufficient specificity renders the Court powerless to enforce any trade secret claim."); *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897-98 (Minn. 1983). Several of Plaintiff's alleged trade secrets are merely general categories of information, namely: (1) Luigino's research and development information; (2) Luigino's financial information; and (3) income statements and documents reflecting volume and sales margins. As evidence of these alleged trade secrets, the Plaintiff directs the Court to deposition testimony of Larry Nelson and Boyd Bulger, a vice president of Foodbrands. While the Court recognizes that the cited testimony relates to specific documents falling within the aforementioned categories, the referenced documents have not been presented to the Court for evaluation, and instead Plaintiff bases its arguments on general categories for which, as a matter of law, trade secret status would be improperly applied.

Moreover, to the extent that the deposition documents actually are the trade secrets for which Plaintiff seeks protection, the Court understands Plaintiff's argument to focus on the confidentiality agreement governing the parties' negotiations and a parallel responsibility attributed to Peterson as a member of the Luigino's board rather than the proprietary nature of the

information contained in these documents. As the Minnesota Supreme Court stated in *Electro-Craft*: "In defining the existence of a trade secret as the threshold issue, we first focus upon the "property rights" in the trade secret rather than on the existence of a confidential relationship." *Electro-Craft*, 332 N.W.2d at 897. The *Electro-Craft* court went on to explain that while a confidential relationship is also a prerequisite to a misappropriation claim and should not be "artificially separated" for purposes of analysis, to find a trade secret based only on a confidential relationship would "come dangerously close to expanding the trade secret act into a catchall for industrial torts." *Id.* Accordingly, the Court finds that: (1) Luigino's research and development information; (2) Luigino's financial information; and (3) income statements and documents reflecting volume and sales margins, are not trade secrets, and to the extent that Plaintiff seeks to protect the use of the information in these general categories, Plaintiff's claims of breach of contract and breach of fiduciary duty provide the appropriate avenue for remedy.

With respect to the remaining alleged trade secrets: (1) the details pertaining to the launch of Howlin' Coyote; (2) Luigino's top 10 customers by volume; (3) the Offering Circular; (4) a second Offering Circular pertaining to snack items; and (5) EBITDA projections for Luigino's through 2004;" the Court finds that genuine disputes of fact remain as to whether such information has independent economic value from secrecy and was not generally known or readily ascertainable, and whether Plaintiff took reasonable efforts to maintain its secrecy. As such, while the evidence is certainly not clear nor overwhelming, the Court finds that a reasonable trier of fact could find that each of the above five pieces of information is a trade secret.

The Court's analysis, however, cannot stop there. Even if certain information could be found by a trier of fact to warrant trade secret status, the Court must still evaluate whether a trier of fact could also find that such trade secrets were misappropriated.

**c. "Misappropriation"**

Misappropriation is defined by statute as:

> (i) [the] acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (ii) disclosure or use of a trade secret of another without express or implied consent by a person who
>
> (A) used improper means to acquire knowledge of the trade secret; or
>
> (B) at the time of disclosure or use, knew or had reason to know that the discloser's or user's knowledge of the trade secret was
>
> (I) derived from or through a person who had utilized improper means to acquire it;
>
> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
>
> * * *

Minn. Stat. § 325C.01, subd. 3. "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic means." Minn. Stat. § 325C.01, subd. 2.

With respect to Defendant Peterson and any information he may have received as a member of the Luigino's board, as the Court explained in its evaluation of the previous claim and as it will elaborate further below, Plaintiff has directed the Court to no evidence that Peterson made a misrepresentation on the questionnaire nor that he knew of the Jose Ole line. Moreover, Plaintiff has failed to direct the Court to any evidence in the record that Peterson used any information to somehow promote the development and ultimate launch of Jose Ole. The only evidence that Plaintiff points to is deposition testimony of Larry Shipley that states that Peterson told Shipley that Luigino's purchased Howlin' Coyote. As a matter of law, this communication,

without more, however, is not a trade secret and cannot support an inference that Peterson somehow misappropriated certain proprietary information.

With respect to the information shared during the negotiations, Plaintiff also fails to direct the Court to any evidence that could reasonably support an inference that Peterson or IBP used such information to launch Jose Ole. Even if individuals such as Devening, O'Ray, and Shipley had knowledge of the Offering Memorandum, Plaintiff has made no competent showing of how such information was used to launch Jose Ole in competition with it. While the Court recognizes that misappropriation is often difficult to prove by direct evidence and is instead often established by a cumulation of circumstantial evidence, the Court still finds that Plaintiff directs the Court to no more than conclusory allegations and the timing of the Jose Ole launch, and, without more, there are insufficient facts that, if proven, could support an inference of misappropriation. Plaintiff fails to identify which information was used, how it was used, and what circumstantial evidence within the Jose Ole product line serves to indicate either, especially when several of the products within the Jose Ole product line are simply repackaged varieties of SBI's previous products, *e.g.*, burrito, fajita burrito, chimichangas, wraps, and taquitos. To the extent that Jose Ole incorporates additional products not previously produced by SBI, such as bowls, there is no evidence that the ideas for these products were the property of Luigino's. To the contrary, the record reflects that frozen food served in bowls was already present in the frozen food market.

Moreover, the Court finds it of particular note that the parties contemplated the possibility that a competing product line or business practice could be independently developed by IBP, without risking violation of the Confidentiality Agreement. Plaintiff's conclusory allegations, without more, cannot rebut the evidence that SBI independently developed Jose Ole without the

knowledge and assistance of any information acquired by IBP. For the above reasons, the Court finds summary judgment to be appropriate on Plaintiff's claims of misappropriation.

**iii. Breach of Fiduciary Duty**

Plaintiff's breach of fiduciary claim is closely related to its claim of misappropriation and is subject to the same infirmities. Plaintiff alleges that Defendant Peterson breached his fiduciary duty as a member of Luigino's board of directors by: "(1) splitting his loyalties by serving on the Luigino's Board on behalf of IBP without Luigino's knowledge; (2) engaging in developing a directly competitive [product] [*sic*] (to Luigino's) business through IBP; and (3) usurping the corporate opportunity of Jose Ole from Luigino's." Simply because a director of one company is also a director of another company with a competing interest does not render the director in breach of his fiduciary duties. *Astarte, Inc. v. Pacific Indus. Sys., Inc.*, 865 F. Supp. 693, 705 (D. Colo. 1994) ("Multiple Loyalties do not, *per se*, constitute a breach of fiduciary duty."). While such relationships may rightly cause a court to look more closely at the director's conduct for evidence of breach, the relationships alone are insufficient to support a claim for breach of fiduciary duty. In the instant case, even if Peterson made the statement that he sat on the Luigino's board as a representative of IBP, Plaintiff was well aware of the business interests of IBP, including its frozen food line (except for the prospective Jose Ole) and indeed invited Peterson to serve on the board. To the extent that Plaintiff is arguing that Peterson's conflicting interest was the Jose Ole product line, as the Court has stated before, Plaintiff has failed to present evidence that would support a finding that Peterson knew of its development and kept such knowledge from Luigino's.

In order to establish a colorable claim for breach of fiduciary duty, Plaintiff would have to show that Peterson improperly used his position on the Luigino's board to promote the

development and launch of Jose Ole or, conversely, to hinder Luigino's from pursuing Howlin' Coyote, Carlos & Maria's, Michelina's Fiesta, or any other such product line that could be considered to be in competition with Jose Ole. The Court makes no attempt to settle the raging dispute over which frozen food items compete with which. As the Court has previously stated, the parties' definitions, particularly the Plaintiff's, have vacillated over the course of this litigation. Nonetheless, irrespective of which definition of "competition" is appropriately applied, Plaintiff has made no showing that Peterson used any information he gained as a board member, or, for that matter, any experience or information he gained in *any* capacity to facilitate the launch of Jose Ole, nor that he used his position on the board to thwart Luigino's foray into the Mexican market.

With respect to whether Peterson usurped a corporate opportunity, Luigino's must establish that: (1) the business opportunity to launch the Jose Ole product line was a corporate opportunity within Luigino's "line of business"; and (2) Peterson violated his fiduciary duties of loyalty, good faith, and fair dealing toward Luigino's. *Miller v. Miller*, 222 N.W.2d 71, 81 (Minn. 1974). In determining whether a business opportunity is a corporate opportunity, a finder of fact must look to the totality of the circumstances. *Id.* The Minnesota Supreme Court has held that a corporation can have no interest and a fiduciary may thus take advantage of an opportunity, if: (1) a corporation declines, because of legal barriers, to avail itself of the opportunity; *or* (2) it is the settled policy of the corporation not to engage in a particular line of business; *or* (3) the corporation has declined the opportunity for business reasons; *or* (4) the opportunity is not available to the corporation either because a party refuses to deal with it or because the corporation sought, but without success, to obtain it; *or* (5) in some other instances which might

render the opportunity extraneous to the corporation's business. *Diedrick v. Helm*, 14 N.W.2d 913, 920 (Minn. 1944).

The undisputed facts show that Luigino's declined the pursuit of a Mexican frozen food line whether by ceasing production of Carlos & Maria's, by declining to sell products other than those that could be deemed Southwestern/Caribbean/Cajun, or by declining to promote Howlin' Coyote in 2000, either as a "departure from Mexican" or as a predecessor to any Mexican line like Michelina's Fiesta. Plaintiff has failed to direct the Court to any evidence of Michelina's Fiesta product line or the prospect of any such line that pre-dates the launch of Jose Ole. Luigino's relies solely on the alleged presentation by Kozlak that Howlin' Coyote was intended to be a beachhead for a broader product line that would include Mexican frozen foods such as those now sold as Michelina's Fiesta. However, Plaintiff provides no explanation for Paulucci's decision to sideline Howlin' Coyote in January 2000 before he knew of the existence of Jose Ole.

Nonetheless, even if a trier of fact could find that Jose Ole is a corporate opportunity that Luigino's had not already rejected, Plaintiff, as a matter of law, has alleged insufficient evidence that could support a finding that Peterson breached his fiduciary duties of loyalty, good faith, and fair dealing. Plaintiff has made no showing that Peterson somehow used any information or experience that he gained as a Luigino's board member in order to develop and launch the Jose Ole line. Moreover, Plaintiff has failed to make a showing that Peterson even knew of the Jose Ole line as it was being developed. The only evidence that Peterson even knew of Jose Ole is that he, as a board member of IBP, was asked to approve a capital expenditure to launch Jose Ole. Even if Peterson's fiduciary responsibilities obligated him to disclose the launch of the Jose Ole line once he was made aware of its existence in January 2000, Plaintiff can make no colorable claim that such a failure was the cause of any damages experienced by Luigino's. While the

presence of Jose Ole in the frozen food market may have impacted Luigino's financial success in some way, Plaintiff can prove no causal link through Peterson's presence on Luigino's board nor even by his failure to alert Luigino's of the launch of Jose Ole.

**iv. Breach of Contract**

Plaintiff's breach of contract claim relates to the Confidentiality Agreement and Plaintiff's contention that IBP breached the agreement by allowing third-party consultants and certain IBP employees unauthorized access to the Confidential Memorandum, without the requisite written permission of Luigino's or the "need-to-know basis." Specifically, Plaintiff contends that: (1) Defendant IBP failed to obtain written permission before disclosing the Confidential Offering Memorandum and "detailed financial information" to IBP's consultant, Bain & Company; and (2) IBP wrongfully disclosed the Offering Memorandum to Randy Devening because he did not *need to know* its contents.

The parties do not dispute that the Confidentiality Agreement imposed a duty upon IBP to maintain the confidentiality of proprietary information exchanged within the course of the Luigino's/IBP negotiations. The parties do dispute, however, whether that agreement was breached, given how information was exchanged and to whom. With respect to the provision of the Offering Memorandum to Randy Devening, Defendants maintain that it was done on a need-to-know basis. Plaintiff's only response is to assert that Shipley and Peterson "flatly" contradict Devening's belief that Luigino's, if acquired, would fall under his control of Foodbrands. In support of this contention, however, Plaintiff's only cite to the record yields no support whatsoever. Indeed, the subject matter cited, a colloquy between the counsel present at deposition, is completely irrelevant to the Plaintiff's position. Plaintiff further provides no alternative explanation why the input of Devening, the president of IBP's frozen food subsidiary,

would not be integral to IBP's decision-making process. Plaintiff has failed to create a dispute of fact with respect to whether IBP breached its agreement by providing the memorandum to Devening.

With respect to the information provided to Bain & Company, Defendants maintain that Luigino's waived the constraint of the agreement because IBP requested coverage of Bain & Company under the agreement, and Luigino's freely provided information to Bain & Company during meetings and via correspondence. Plaintiff does not dispute Defendants' explanation, but, rather, contends that the lack of written permission constitutes a clear breach of the agreement and that Patrick O'Ray's communications with Bain & Company somehow indicate that information was used in competition against Luigino's. There is no evidence in the record that, in response to IBP's request, Luigino's actually provided written consent to include Bain & Company under the Confidentiality Agreement. There is also no evidence in the record that O'Ray's communication with Bain & Company had anything to do with the acquisition of Luigino's. There is evidence in the record, however, that Luigino's knowingly participated in meetings at which a representative of Bain & Company was present and knowingly provided information for review by Bain & Company. To now argue breach based upon conduct that Luigino's arguably knowingly and voluntarily facilitated rings hollow with the Court. However, even to the extent that Plaintiff has created an issue of fact with respect to disclosure to Bain & Company, Plaintiff has failed to address a crucial element to its claim–an alleged causal link between the alleged breach and damages.

Plaintiff maintains that because it seeks summary judgment only on the elements of duty and breach, the Court need not reach the issues of causation and damages. However, Plaintiff has failed to make even the sparest allegations that, if found to be true, would support a finding that

any disclosure was the direct or proximate cause of any damage to Luigino's. Moreover, even barring the issue of causation and assuming that the alleged wrongful result was the launch of Jose Ole, Plaintiff has not identified what information within the Offering Memorandum or within the vague category of "detailed financial information" was somehow used to launch Jose Ole. Indeed, Plaintiff's only rebuttal against the contention and supporting evidence that Jose Ole was independently developed is a conclusory denial. Even if the Court were to find that Plaintiff has made a colorable showing of duty and breach, the Court cannot find that Plaintiff has alleged any set of facts which, if proven, could reasonably be found to provide a causal link to Plaintiff's alleged damages.

**3. Conclusion**

Based on the foregoing reasons, the Court finds that, as a matter of law, Plaintiff has failed to create a material dispute of fact on any of its claims, and, as such, summary judgment in favor of Defendants is appropriate. Essentially, Plaintiff has attempted to persuade the Court that the circumstances surrounding the launch of Jose Ole are enough to create an inference of impropriety and thus a dispute of fact on each of its claims. Plaintiff has failed, however, to assert facts that could support a finding of a causal link between any alleged impropriety and alleged damages. The record before the Court is certainly dense and complex, and it is clear that the parties disagree as to many of the facts within it. However, the crucial facts of causation are fatally omitted from Plaintiff's case, and the Court, upon its extensive review of the record, finds insufficient evidence on the issue as a matter of law. The Court's ruling is not inconsistent with the principle that circumstantial evidence is often the only evidence available to prove such claims as Plaintiff has asserted here. However, even with this principle in mind, the Court finds summary judgment to be wholly appropriate.

For the reasons stated, **IT IS HEREBY ORDERED** THAT:

1. Plaintiff's Motion to Withdraw and Amend Responses to Defendants' Requests for Admissions (Doc. No. 170) is **DENIED**;

2. Plaintiff's Motion for Summary Judgment (Doc. Nos. 100 & 130) is **DENIED**;

3. Defendant's Motion for Summary Judgment (Doc. No. 143) is **GRANTED**;

4. Plaintiff's *Daubert* Motion to Exclude the Testimony and Opinion of Defendants' Expert, Cate Elsten (Doc. No. 137) is **DENIED AS MOOT**;

5. Defendants' Motion to Strike the Expert Opinions and Report of Donald Nicholson (Doc. No. 159) is **DENIED AS MOOT;**

6. Defendants' Motion to Strike the Expert Opinions and Report of Gordon Wade (Doc. No. 155) is **DENIED AS MOOT**;

7. Defendants' Motion to Strike the Expert Opinions and Report of Professor John C. Matheson (Doc. No. 151) is **DENIED AS MOOT**; and,

8. The Second Amended Complaint (Doc. No. 95) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 28, 2002

DONOVAN W. FRANK
Judge of United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*